UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

STEPHANIE MILLHOFF,

                    Plaintiff,

v.                                                    4:04CV111

JO ANNE B. BARNHART,
Commissioner of Social Security,

                    Defendant.


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, by her father, Timothy W. Millhoff, brought this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Secretary of Health and Human Services denying her receipt of supplemental security income (SSI), under the Social Security Act. Plaintiff and defendant have both filed motions for summary judgment. The motions were referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 29 of the Rules of the United States District Court for the Eastern District of Virginia by order of reference entered December 22, 2004.

## I. STATEMENT OF THE CASE

### A.  Procedural Background

On January 24, 1990, Timothy W. Millhoff filed an application for supplemental social security income on behalf of plaintiff, who was then an infant under the age of eighteen, alleging that plaintiff had been disabled since birth, due to a learning disability.  (R. at 15.) The claim was initially denied on June 21, 1990.  Plaintiff's case was reviewed in accordance with the expanded rules for determining childhood

disability in accordance with <u>Sullivan v. Zebley</u>, 493 U.S. 521 (1990). Upon determining that plaintiff was a member of the <u>Zebley</u> class, her claim was reviewed.  By a revised initial medical determination dated June 17, 1991, it was found that plaintiff was disabled beginning January 1, 1990, due to attention deficit hyperactivity disorder, based on an individualized functional assessment.  The disorder resulted in marked limitations in the area of concentration, persistence or pace, and moderate limitations in the areas of social functioning and personal/behavioral development.  The disorder significantly limited plaintiff's ability to function independently, appropriately, and effectively in an age-appropriate manner.  Thus, plaintiff's impairment was of comparable severity to one which would disable an adult.

In 1996, the definition of disability for children was changed pursuant to Public Law 104-193.  Upon subsequent review, a modified initial determination was made on July 8, 1997, finding that plaintiff's disability continued, based on a finding of partial complex[1] seizures, the severity of which met the criteria for Section 111.02A2 of Part B, Appendix 1, Subpart P, Social Security Regulation No. 4.  On July 11, 1997, Suzanne Bartlett, plaintiff's mother and representative, was notified that plaintiff continued to be disabled. (R. at 15-16.)

---

[1] A type of partial seizure associated with the disease pertaining to the lateral region of the brain and characterized by varying degrees of impairment of consciousness; the patient performs aimless, apparently undirected behavior that is not under conscious control, performed without conscious knowledge, and is later affected with or characterized by lack or loss of memory for them.  An attack is often preceded by hallucinatory aura, most often visual or auditory but sometimes involving the other senses.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1676 (30th ed. 2003).

On October 1, 1999, plaintiff attained the age of eighteen and was no longer considered a "child," pursuant to Public Law 104-193. 20 CFR 416.120(c)(4)(an individual attains a given age on the first moment of the day preceding the anniversary of his birth corresponding to such age.) (R. at 16.)  An age eighteen redetermination was conducted, and plaintiff was found to be no longer disabled within the meaning of the SSA, as amended November 30, 2000, because she was not disabled under the disability rules for adults.  On November 30, 2000, plaintiff's mother was notified that plaintiff's eligibility for benefits was terminated effective January 31, 2001.  (Id.)

On December 11, 2000, plaintiff filed a request for reconsideration of the redetermination.  A request for a hearing before a disability hearing officer (DHO), was timely filed, and plaintiff and her mother testified at a hearing on March 19, 2002.

On April 2, 2002, the DHO found that plaintiff was not disabled, and plaintiff was notified on April 5, 2002, that her disability checks would cease.  On April 15, 2002, a request for hearing before an Administrative Law Judge (ALJ), was timely filed.  The hearing was conducted on January 16, 2003.  Plaintiff elected not to be represented by counsel, and plaintiff, Bartlett, and Melissa Prince, a friend, testified, in the course of the hearing, as did a vocational expert (VE).  On February 13, 2003, the ALJ found that plaintiff was not disabled under the adult standards under sections 1602 and 1614(a)(3)(A), respectively of the SSA, as amended.  Plaintiff's eligibility for SSI ended effective January 31, 2001.  (R. at 24.)

On September 8, 2004, plaintiff filed a complaint in federal court, appealing the Commissioner's final decision.  On December 3, 2004, defendant filed an answer to the complaint.   On January 21, 2005, plaintiff filed a motion for summary judgment, and on February 18, 2005, defendant filed a motion for summary judgment.  This matter is now ripe for consideration.

## B.  Factual Background

### 1.  Medical history

#### a.  Treating physicians

In April, 1996, plaintiff underwent a psycho-educational evaluation, which revealed that she had average academic potential but was performing below that potential due, in part, to seizures.  (R. at 198.)  In May, 1996, Dr. H. Blair Marstellar diagnosed plaintiff with partial complex seizures.  (R. at 217.)  EEG testing in 1997, revealed normal results to "slightly abnormal" results, and Marstellar prescribed Lamictal[2] and Tegretol.[3]  (R. at 207, 213, 217.)  The seizure disorder was the basis for the July, 1997, continuation of plaintiff's SSI benefits.

In October, 1998, plaintiff requested assistance from the Peninsula Center for Independent Living (PCIL).  (R. at 285-89.)  In her intake evaluation, plaintiff stated that she engaged in leisure

---

[2]   Trademark for the preparation of an agent that prevents or relieves convulsions, used as a measure in the treatment of partial seizures in adults with epilepsy.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 993.

[3]   Trademark for the preparation of an agent that prevents or relieves convulsions and pain extending along the course of one or more nerves, used in the treatment of pain associated with excruciating episodic pain in the area supplied by the fifth cranial nerve and in epilepsy manifested by partial seizures, administered orally.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1861.

4

activities such as playing cards, bingo, and scrabble; doing crafts and woodwork; and bowling, swimming, and outdoor sports.  Plaintiff also indicated that she depended on others to handle her financial affairs, could see well enough to read regular size print, depended on others to make most of her decisions, performed some housework, was independent in self-care, socialized regularly, and enjoyed good relations with others. (Id.)

On October 21, 1998, plaintiff began individual counseling at PCIL.  (R. at 279.)  During subsequent counseling sessions, plaintiff was counseled on returning to high school, the importance of attending her counseling sessions, and participating as a volunteer for a greeter's program at the Hampton City Hall. (R. at 266-79.)  Plaintiff indicated during her subsequent counseling sessions that she was only interested in part-time employment because she was receiving SSI, and she did not want to be "penalized for working a full time job."  (R. at 272.)  She was advised by her counselor to continue seeking gainful employment, in addition to volunteering in the greeters program.  (R. at 270.)

On December 2, 1999, plaintiff was examined by Dr. Curtis Burke of the Riverside Family Practice Center (hereinafter "Riverside"), at which time she admitted not taking her anti-seizure medication as prescribed because "it was inconvenient."  (R. at 262-64.)  Burke described plaintiff as being in no acute distress, with normal findings on physical examination.  Burke noted that he was not convinced that plaintiff "actually has a seizure disorder. . . . Further complicating the issue is the strong potential for secondary gain for the patient and

her mother - disability, no school, attention from the medical community and friends, etc. ."  (R. at 263.)

On January 6, 2000, plaintiff was examined by Dr. Amy Gabriel at Riverside.  Gabriel described plaintiff as being in no acute distress, sexually active, pregnant, and "seizure free for several months."  (R. at 259-60.)

On January 14, 2000, plaintiff saw Dr. Vernon Kirk, Jr., a neurologist.  (R. at 254-56, 337-39.)  On physical examination, Kirk found plaintiff to be normal, and he noted that plaintiff indicated that her seizures were precipitated by stress and her diet, specifically MSG and Red Dye #40, which plaintiff is allergic to.  (R. at 255.)  Because plaintiff's seizures seemed to occur when she had completed her dose of Tegretol, Kirk prescribed a change in medication from Tegretol to Carbatrol[4] and continued the Lamictal.  (Id.)

On January 17, 2000, plaintiff was seen by Dr. Karen Bruder, a gynecologist at Riverside.  Bruder described plaintiff as "feeling well," using marijuana daily, smoking one and one-half packs of cigarettes daily, alert, and in no acute distress.  (R. at 249-52.) During the visit, plaintiff's mother reported increasing seizure activity while plaintiff was asleep.  (Id.)

On February 14, 2000, plaintiff was seen by Kirk, reporting "no significant problems" in the prior month.  Plaintiff's mother reported that the seizure episodes had declined significantly, that

---

[4] Trademark for preparations of an agent that prevents or relieves convulsions and pain extending along the course of one or more nerves, used in the treatment of pain associated with excruciating episodic pain in the area supplied by the fifth cranial nerve and in epilepsy manifested by partial seizures, administered orally.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 290.

plaintiff "no longer [had] the wild fluctuations at the end of dose that were noted previously," and that the use of Carbatrol had brought the seizures "under better control."  (R. at 247-48, 335-36.)  Plaintiff complained of fatigue, which Kirk attributed to obstructive sleep apnea, a condition which he viewed as potentially contributory to plaintiff's seizures.   Kirk's  diagnosis  was  subsequently  confirmed  by  a polysomnogram[5] conducted on February 29, 2000.  (R. at 340.)

On February 9, 2000, plaintiff began counseling with Wanda Abbott, a social worker.  (R. at 223-29.)  According to Abbott, plaintiff exhibited "no clear evidence of depression" and was focused primarily on issues concerning her boyfriend.  (Id.)  Plaintiff indicated that she was working approximately twelve hours per week as a secretary at PCIL,  but she wanted to pursue being a beautician.  (R. at 223, 227.)  In April, 2000, plaintiff terminated her sessions with Abbott because plaintiff was too busy.  (R. at 269.)  On February 19, 2000, plaintiff voluntarily terminated her pregnancy.  (R. at 334.)

On March 8, 2000, plaintiff saw Burke, at which time it was confirmed that the partial seizures had "decreased in frequency since starting on the Carbatrol."  (R. at 244.)  Burke described plaintiff as being in no acute distress and advised her to stop smoking marijuana and cigarettes.  (R. at 244-45.)

On March 22, 2000, plaintiff saw Kirk, at which time it was noted that she was "doing fairly well," with "no major seizure episodes,"

---

[5]   A polygraphic recording during sleep of multiple physiologic variables, both directly and indirectly related to the state and stages of sleep, to assess possible biological causes of sleep disorders.   DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1485.

normal results on physical examination, and she demonstrated a greater degree of alertness than had been exhibited on prior visits.  (R. at 240-41, 332-33.)  Kirk prescribed an auto adjusting nasal continuous positive airway pressure device (CPAPD), for use while sleeping, which he anticipated may significantly reduce the frequency of the seizures.  (R. at 241.)

On April 29, 2000, plaintiff visited the emergency room at Sentara Hospital in Hampton, Virginia, due to a right knee injury she suffered while roller skating.  (R. at 233.)  Dr. William Ritchie noted that there was no effusion or soft tissue calcifications, her joint spaces were normal, and there was no fracture or dislocation.  (R. at 235.)

On May 3, 2000, plaintiff was seen by Kirk.  Kirk noted that the night spells were "almost eliminated" and that plaintiff was using the CPAPD.  (R. at 238.)  Plaintiff indicated that when she used the CPAPD, she tended not to have any seizures, and on the days when she did not use the CPAPD, she tended to suffer small seizure events at night. (R. at 238.)  On June 28, 2000, plaintiff saw Kirk for a follow-up, at which time he noted that she had not been using the CPAPD.  (R. at 236.) Kirk further noted that plaintiff's mother indicated increased symptoms of daytime sleepiness.  Kirk stated that plaintiff "had occasional relatively light seizures, but none of the more severe seizure activity she has [had] in the past."  (Id.)  Kirk concluded by observing that the seizure activity was worsened by sleep deprivation, related to the obstructive sleep apnea, which resolved with the use of the  CPAPD.

On December 13, 2000, plaintiff was examined by Dr. Jerome Provenzano at Riverside's Suburban Clinic.  (R. at 292.)  Provenzano indicated that plaintiff continued to be noncompliant with use of the CPAPD, and he stressed to her the importance of using the CPAPD or she would be fatigued the "rest of her life." (Id. )  Provenzano also noted that plaintiff smoked cigarettes regularly, occasionally smoked marijuana, and reported no seizure-related symptoms.  On January 16, 2001, plaintiff saw Provenzano for a follow-up, where he noted that she had been using the CPAPD for sleep apnea and was described as alert and interactive.  Provenzano also noted that plaintiff was having increased headaches, which were "treated successfully with Midrin."  (Id.)

On January 30, 2001, plaintiff saw Kirk, reporting that she had been using the CPAPD fairly consistently, which was corroborated by her mother.  (R. at 292.)  Plaintiff's mother reported that as a result of using the CPAPD, plaintiff had "significantly fewer episodes . . ." (Id.)  It was also noted that as long as plaintiff remembered to take her medication and used the CPAPD, she seldom suffered "significant seizures."  (Id.)

On February 13, 2001, plaintiff saw Provenzano, at which time he noted that she was alert, interactive, in no acute distress, and reported no seizure-related symptoms.  Plaintiff complained of some right knee pain, which was "responding to Naprosyn" and had good range of motion.  (R. at 291.)

On September 27, 2001, plaintiff was seen by Dr. Douglas Okay at the Suburban Clinic, complaining of migraines and right knee pain. (R. at 291.)  Okay noted normal motor strength and that plaintiff was in

9

"no acute distress."   (Id.)   Okay gave plaintiff samples of Zomig for migraines and referred plaintiff to Dr. Robert Snyder, an orthopedic specialist, for the knee pain.  (R. at 322.)

On October 2, 2001, plaintiff saw Snyder, and he ordered an MRI, which was performed on October 9, 2001. (R. at 294.)   The MRI revealed lateral deviation of the patella and an inflamed bursa on the medial aspect of the knee.  (R. at 321.)

On October 16, 2001, during a follow-up visit, Okay noted that plaintiff experienced the seizures while on Zomig because Zomig contains Red Dye #40.  (R. at 290.)  Okay noted that as a result, plaintiff took Excedrin Migraine, which helped.  Okay indicated that plaintiff should continue taking Excedrin for the migraines and was otherwise in no acute distress.  (Id.)

On December 12, 2001, plaintiff was evaluated by Snyder for spinal stenosis[6] and herniated nucleus pulposus.[7]  Plaintiff's subsequent complaints of back pain were attributed to mild degenerative changes and were successfully treated with physical therapy.  (R. at 293, 317-18.)

On March 12, 2002, plaintiff was seen by Snyder, at which time Snyder described her as "nontender" in the back area.  (R. at 317.) Snyder had prescribed Celebrex[8] on a prior visit because plaintiff was

---

[6]  An abnormal narrowing of a duct or canal.  Dorland's Illustrated Medical Dictionary at 1757.

[7]  Bulging of intervertebral disk.  Dorland's Illustrated Medical Dictionary at 1289.

[8]  Trademark for the preparation of a nonsteroidal anti-inflammatory drug, used for symptomatic treatment of osteoarthritis and rheumatoid arthritis; administered orally.  Dorland's Illustrated Medical Dictionary at 315.

unable to take any anti-inflammatory medication, but plaintiff indicated that after taking Celebrex she experienced a seizure.  However, Snyder noted that he did not believe the medication was related to the seizure. (Id.)

On August 8, 2002, Dr. J.F. Wilson performed a tonsillectomy, due to findings of obstructive tonsillar hypertrophy[9], obstructive sleep apnea, and the belief that the seizures were due to hypoxemia[10] from apneic[11] episodes.  (R. at 377.)  On September 25, 2002, Wilson noted that plaintiff was "doing well," with an "excellent airway," "excellent healing," and "no more snoring and no more observed apnea."  (R. at 364.) Wilson also noted that continued use of the CPAPD was required.  (R. at 367.)

On August 28, 2002, plaintiff saw Marstellar, at which time he noted her history of non-compliance with prescribed medication and stated that plaintiff continued to be noncompliant with use of the CPAPD.  (R. at 384-86.)  Marstellar also noted that MRI and EEG testing revealed no abnormalities.  An EEG on August 30, 2002, revealed the possibility of a focal disorder in plaintiff's left temporal region, and an MRI on September 12, 2002, yielded normal results.  (R. at 388.)

On October 14, 2002, plaintiff saw Okay, complaining of blurred and double vision.  (R. at 380-82.)  Okay noted that there were

---

[9]   The enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 890.

[10]   Deficient oxygenation of the blood. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 900

[11]   Pertaining to apnea or affected with apnea. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 116.

no reported seizure-related symptoms, that plaintiff was in no acute distress, and that she had a normal visual field and corrected vision of 20/30. Okay further noted that plaintiff continued to use marijuana. (Id.)

    b. <u>Disability Determination Services (DDS) physicians</u>

On December 13, 2001, plaintiff underwent a psychiatric review by a DDS physician and psychiatrist. (R. at 296.) The DDS physician found that a medically determinable impairment was present, but the impairment did not precisely satisfy the diagnostic criteria in the form of a learning disorder. (R. at 297.) The DDS physician noted that plaintiff had mild restriction of daily activities, no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (R. at 306.)

Because plaintiff did not satisfy the criteria for Category "B" of the listings, the DDS physician considered the criteria for Category "C" of the listings. The DDS physician concluded that plaintiff did not demonstrate behavior that would satisfy the "C" criteria either. (R. at 307.)

On November 25, 2002, a residual functional capacity (RFC) assessment was conducted, which revealed that plaintiff had no exertional limitations. (R. at 311.) Furthermore, it was determined that plaintiff can frequently climb ramps and stairs; can balance, stoop, kneel, crouch, and crawl; but can never climb ladders, ropes, or scaffolds. (R. at 312.) It should be noted that the DDS physician indicated that plaintiff should avoid working at unprotected heights or around dangerous

machinery.   Plaintiff  was  found  to  have  no  manipulative,  visual,
communicative, or environmental limitations.  (R. at 312-14.)  Plaintiff
was  found  to  be  partially  credible,  in  that  her  complaints  did  not
significantly limit her ability to function. (R. at 315.)

### 2.  <u>**Plaintiff's testimony before the ALJ**</u>.

#### a.  <u>Employment history</u>

Plaintiff testified that she dropped out of high school in the
tenth grade, has not received a GED, and has no technical or vocational
training.  (R. at 104.)  Plaintiff indicated that when she was employed
at PCIL, she participated in a "greeters program," where she answered the
phone, but she never completed the program.  (R. at 404-05.)  Plaintiff
testified that she had seizures during her participation in the program
and could not sit still.   Plaintiff stated that she can read but has
trouble  writing  and  can  add  and  subtract  but  has  problems  with
multiplication and division.  Plaintiff further stated that she has never
had any other source of income other than SSI benefits.  (<u>Id.</u>)

#### b.  <u>Impairments, daily activities, and RFC</u>

Plaintiff testified that she gets up at 10:00 a.m., takes her
medication, and either lies back down until noon or stays up and watches
TV.  (R. at 406.)  She stated that she usually takes a nap at 4:00 p.m.
and, at times, gets up and does dishes or helps clean the kitchen.
Plaintiff  testified  that  she  also  rakes  leaves  and  helps  her  mother
garden  and  goes  to  the  grocery  store.   (R. at  406-07.)   Plaintiff
indicated that she goes out once a week to a coffee house in Virginia
Beach to play cards and listens to the radio with a friend, who is aware
of the epilepsy and knows what to do if she has problems.  (R. at 407.)

During the evening, she spends time with her parents and plays cribbage with her father. Plaintiff stated that she usually goes to bed at midnight but sometimes has trouble sleeping. (Id.)

Plaintiff testified that her biggest problems are her vision and the seizures. (R. at 408.) She stated that can read the newspaper or a book and is able to do normal activities when she wears glasses. Plaintiff further stated that on a "good day" during a seizure, she either rocks back and forth or loses total control of her body, makes noises, and her legs go everywhere. (Id.) She testified that on a "bad day," if she was in the middle of doing something when a seizure came upon her, she would continue with the activity, not realizing that she was having a seizure. On one such occasion, she almost burned herself, and she has hit her head several times during episodes such as these. (R. at 408-09.) Plaintiff testified that she usually falls asleep after these episodes from thirty minutes to as long as five hours. (R. at 410.) Plaintiff stated that the episodes normally occur twice a week or more. She testified that it would be dangerous for her to work, since she is never aware of when she is going to have a seizure and could fall, hit her head, and severely hurt herself. (Id.)

Plaintiff testified that she has obstructive sleep apnea, which requires the use of a CPAPD. (R. at 411.) She indicated that as a result of the apnea, she is tired all the time and acts childish. She indicated that she uses the CPAPD but unconsciously removes it during the night. (Id.)

Plaintiff testified that sleepiness is a side effect of the medications she takes. (R. at 412.) She also indicated that she tries

14

to take her medication on schedule everyday but, at times, she forgets and has to be reminded by her parents.  (Id.)

### 3.  Testimony of Melissa LeAnn Prince

Prince testified that she has been plaintiff's friend since the ninth grade.  (R. at 413.)  Prince indicated that, at a minimum, they see each other once a week and that she has witnessed plaintiff having a seizure.  Prince stated that plaintiff attended special classes in high school because she had trouble with school work.  Prince testified that plaintiff had problems taking her medication and would forget to take it at times.  Prince further testified that plaintiff's problems were so numerous that she could not remember them all.  (Id.)

Prince described plaintiff's seizures as "grand mal" and stated that plaintiff would "sit up in bed and she'll rock back and forth, you know, jerking the bed, and, you know, shaking up everything. They're pretty rough."  (R. at 414.)  Prince testified that during the day, plaintiff would "daze off" and stare.  She stated that she has seen plaintiff "do plenty of those. . . . she'll just be staring off and then she'll just come back and be like, . . . what happened again or what did you say?"  (Id.)  According to Prince, the episodes would last a minute or two.  (R. at 415.)  Prince testified that after an episode, plaintiff complained of having headaches or being tired.  Prince stated that when plaintiff experiences a small seizure, she will ask plaintiff if she took her medication, if she is okay, [and] if she is "feeling anything." (Id.)

#### 4. Testimony of Suzanne Elizabeth Bartlett

Bartlett, plaintiff's mother, testified that she has witnessed plaintiff's small (petit mal) and large (grand mal) seizures. (R. at 417.) Bartlett stated that a grand mal seizure may begin with leg movements, then flopping back and forth, like a fish. She further stated that plaintiff does a double flip all the way off the bed and sits up and down; up and down. Bartlett indicated that when plaintiff gets to that point, both of her eyes are dilated and fixed and she's unaware of anything going on around her. (R. at 418.) Bartlett testified that plaintiff goes into a fish flop, which lasts approximately forty-five seconds, give or take, depending on the severity of the seizure. Bartlett stated that during the seizures, she tries to shield plaintiff the best she can to prevent her from hitting anything. She indicated that when the seizures begin, plaintiff makes an "eee" sound by clenching her teeth and that she goes to plaintiff when she hears her making the sound. (Id.) Bartlett indicated that plaintiff averages having a couple of episodes per week and that the number of episodes depends on how plaintiff has been taking care of herself. Bartlett testified that if plaintiff eats anything that contains MSG or Red Dye #40, within one hour, she will have several grand mal seizures. Bartlett further stated that if plaintiff does not get proper rest, she could experience several seizures. Bartlett testified that the last time plaintiff had a really severe episode, she had over eight seizures in less than two hours. (R. at 419.) Bartlett described plaintiff during minor seizures as having dilated pupils, glassy eyes, a high-pitched voice, and becoming very childish. Bartlett stated that plaintiff becomes very forgetful, for

example, going to the kitchen for a drink of water and forgetting why she went to the kitchen, or by beginning to do something and ending up doing something else because she forgot what she was originally doing. Bartlett indicated that when plaintiff does those things, she has to redirect her.  (R. at 219-20.)

Bartlett testified that on one occasion plaintiff had Prince drop her off outside a friends house, knowing the friend was not home. On another occasion, plaintiff was outside a man's apartment for three and one-half hours, in temperatures below twenty-two degrees, curled up and falling asleep, but she refused to come home.  (R. at 220.) According to Bartlett, plaintiff tends to get in irrational states "a couple [of] times a month."  (Id.)

Bartlett testified that she has to remind plaintiff constantly to take her medications and that when she doesn't watch plaintiff take the medication, plaintiff will not take them.  (R. at 422.)  Bartlett indicated that plaintiff's seizures were "fairly stable, but by not taking her medication as prescribed, the disease has progressed.  (Id.)

The ALJ asked to speak to Bartlett alone, at which time, Bartlett  stated that the disease was going to take plaintiff's life and that her life-span is twenty-five to thirty years old.  (R. at 423-24.) Bartlett stated that in August, 2002, she had to take plaintiff to the emergency room because she was having "multiples" and that they were happening within five minutes of each other.  (Id.)  Bartlett indicated that the next stage is "severe convulsions into [a] coma.  If she goes into a coma, there's no returning it.   There's nothing to turn it around."  (Tr. at 425.)  Bartlett described "multiples" as having one

17

seizure, within ten minutes having another one, and within five minutes
having another.  She testified that after the multiples, the next stage
is unconsciousness and coma. (R. at 424-25.)

### 3.  __The VE's testimony__

Because plaintiff had no previous work experience to use as a
guide, the VE was questioned and asked to presume the individual in
question to be twenty-one years of age, with a ninth grade education, no
past relevant work experience, capable of working at all exertional
levels, but precluded from working around unprotected heights, dangerous
machinery, or operating motor vehicles.  The VE testified that an
individual such as the ALJ described could perform such jobs as that of
a hand packer[12] or  assembler.[13]  (R. at 426.)  However, the VE also
testified that if an individual had limitations and abilities as
described in the testimony, there would be no work available.  (R. at
427.)  The VE stated that there is no difference regarding jobs in the
way the ALJ used them and the way they are described in the Dictionary
of Occupational Titles (DOT).  (Id.)

### C.  __The ALJ's Decision__

At the conclusion of the hearing, the ALJ denied plaintiff's
application for SSI.  (R. at 24.)  At step one of the five-step
evaluation process, the ALJ noted that in redetermination cases, because
of the provisions of section 1619 of the SSA, the determination of

---

[12]  There are 150,000 hand packer positions available nationally and
2,400 locally.  (Tr. at 426.)

[13]  There are 150,000 assembler positions available nationally and
2,000 locally.  (Tr. at 426.)

substantial gainful activity should be skipped.  However, the ALJ noted that plaintiff is not currently working.  (R. at 19.)

At step two, the ALJ determined that plaintiff had a severe impairment as a result of obstructive sleep apnea, partial complex seizure disorder, and obesity (plaintiff is 59" tall and weighs in excess of 180 pounds).  (R. at 19.)  The ALJ considered plaintiff's other complaints, including her eyesight and an adjustment disorder, but determined that based on the overall evidence, the other conditions, whether considered singly or in combination, were nonsevere.  (R. at 20.) Accordingly, the ALJ moved on to step three.

At step three, the ALJ determined that the medical evidence failed to establish that plaintiff's impairments were severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Social Security Regulation No. 4, including those under sections 3.10 (sleep breathing disorders) or 11.02, and 11.03 (seizure disorders).  (R. at 20.)

As the ALJ determined that a finding of "disabled" could be reached based on the medical facts alone, the ALJ moved on to step four, plaintiff's RFC.  The ALJ gave careful consideration to plaintiff's subjective allegations in accordance with the criteria set forth in 20 CFR § 416.929 and Social Security Ruling 96-7p.  (R. at 20.)  The ALJ found plaintiff's statements regarding her impairments and their impact on her ability to work to be partially credible, to the extent supported by the medical evidence, but not adequate to equate to a finding of disability.  The ALJ noted that plaintiff is able to perform household chores, rake leaves, plant flowers, watch TV, listen to the radio, shop,

19

play cards, and socialize.  The ALJ further noted that the medical evidence reflected that her obstructive sleep apnea and seizures are controlled by treatment. (R. at 19-20.)  For example, in May, 2000, it was reported that plaintiff had no symptoms if she was compliant with her treatment.  (R. at 20.)  When plaintiff was using the CPAPD, she tended not to have any seizures, but when she did not use the CPAPD, she would have some small seizures at night.  (Id.)

In June, 2000, plaintiff reported relatively light seizures and sleepiness, but she was not using the CPAPD.  In January, 2001, plaintiff reported significantly fewer minor episodes when using the CPAPD and no significant seizures at all, except when she forgot to take her medication. (R. at 21.)  Plaintiff's consistent use of the CPAPD and compliance with her medication significantly reduced the number of seizures, and the ones she does have are limited to when she is asleep. Because plaintiff's impairments appeared to be having no more than minimal effect on her ability to perform basic work-related activity, the ALJ found that she has no severe impairment.

The ALJ indicated that the DDS's advisory assessment that plaintiff's RFC for work at all exertional levels, except work at unprotected heights or around dangerous machinery due to potential excessive drowsiness and/or seizures when noncompliant and no severe mental impairment, was consistent with the overall evidence. Consequently, the ALJ found that plaintiff has the RFC to perform the nonexertional requirements of work at all exertional levels, except for work at unprotected heights or around hazardous machinery or work involving driving, and there are no exertional limitations or

restrictions.  (R. at 22.)  Plaintiff has not worked in the past and thus has no past relevant work.

At step five the ALJ determined that based on plaintiff's age, education, work experience, and RFC, she would be able to make a successful adjustment to work that exists in significant numbers in the national economy.  (R. at 22.)  Based on the VE's testimony, the ALJ found that plaintiff has the ability to make vocational adjustments to such medium skilled work as a hand packer, stock handler, or an assembler.  (R. at 22.)  The ALJ pointed out that the VE testified that the positions were consistent with information contained in the DOT and its companion publication, the Selected Characteristics of Occupations (SSR 00-4p).  (R. at 22-23.)  Given the VE's testimony, as well as plaintiff's age, education, work experience, and RFC, the ALJ found plaintiff to be "not disabled." (R. at 24.)

### D.  Issues

The issue in this case is whether the ALJ's decision that plaintiff is not entitled to SSI is supported by substantial evidence.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Motion for Summary Judgment Standard

As set forth in Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party can show by affidavits, depositions, admissions, answers to interrogatories, the pleadings, or other evidence, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).  Rule 56 mandates entry of summary judgment against a party who "after adequate time for discovery and upon

motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party is not entitled to summary judgment if there is a genuine issue of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of fact exists if "a reasonable jury could return a verdict for the nonmoving party." Id. In other words, summary judgment appropriately lies only if there can be but one reasonable conclusion as to the verdict. See id.

Finally, as the Fourth Circuit explained,

> [w]e must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion. Summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the non-moving party has the burden to prove.

Tuck v. Henkel Corp., 973 F.2d 371, 374 (4th Cir. 1992)(citations omitted).

### B.  Standard of Review

When an individual makes a claim for DIB/SSI, he or she has the right to a hearing in order to determine whether he or she is disabled. See 42 U.S.C. § 1383(c)(1)(A)(2000). After a final decision has been rendered by the SSA, a party can seek review of the decision by filing a civil action in federal court. See id. at § 1383(c)(3). The factual findings which have been rendered by the Commissioner of Social Security "if supported by substantial evidence, shall be conclusive," and

where a claim has been denied, the "court shall review only the question of conformity with such regulations and the validity of such regulations." Id. at § 405(g). The Commissioner's findings with respect to whether an individual is disabled should not be disturbed, even if the court may disagree with them, as long as the findings are supported by substantial evidence, and the correct law has been applied. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). In determining what is substantial evidence, the Fourth Circuit has held that substantial evidence exists "[i]f there is evidence to justify a refusal to direct a verdict were the case before a jury. . ." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Specific regulations have been promulgated at the direction of Congress by the Secretary of Health and Human Services for the purpose of making an eligibility determination. See 20 C.F.R. § 416 (2000). The social security regulations (SSR) require the ALJ to conduct a five step sequential evaluation of a disability to determine whether a claimant is entitled to benefits. The five steps which the ALJ must follow are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do work activities?

23

3.   Does the individual suffer from an impairment or impairments which meet or equal those listed in the C.F.R. at Appendix 1?

4.   Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5.   Does the individual's impairment or impairments prevent him or her from doing any other work?

See id. at § 404.1520/416.920.  In reviewing a social security case, the ALJ bears the ultimate responsibility for weighing the evidence.  See Hays, 907 F.2d at 1456.

## B.  Discussion

A person is eligible for DIB if he or she is insured for such benefits, has not attained retirement age, has filed an application for such benefits, and is under a disability.  See 42 U.S.C. § 423(a)(2000). The code and SSR carefully detail the requirements which a person must meet to be fully insured and eligible for such insurance benefit payments.  See id. at § 423(c).

The SSI program is designed "to assure a minimum level of income for people who are age sixty-five or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level." 20 C.F.R. § 416.110.  Congress has stated that benefits will be paid to an individual if that person is aged, blind or disabled and has limited income or resources which total less than the dollar figure set out in 42 U.S.C. § 1382(a).

While the requirements for these two types of social security benefits differ, the definitions and terms used to determine if a person

is disabled and, therefore, eligible for such benefits are the same.  A person is considered disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." Id. at § 423(d)(1)(A).  To be disabled, an individual's impairments must be of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  Id. at § 423(d)(2)(A).

a. **Plaintiff has not been engaged in substantial gainful activity**.

The first step in evaluating whether a disability exists requires a determination of whether plaintiff has engaged in substantial gainful activity since the onset of the alleged disability.  See 20 C.F.R. §§ 404.1520; 415.920 (2000).  If a claimant is working, and the work which he or she is doing is considered to be substantial gainful activity, then the claimant will be found not disabled.  See id. at §§ 404.1520(b); 416.920(b).  Substantial gainful activity is defined as "work activity that involves doing significant physical or mental activities . . . even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." Id. at §§ 404.1572(a); 416.972(a); see also id. at §§ 404.1510; 416.910.  In order to be gainful activity, the work activity must be done

for pay or for some type of profit, even if that profit is not realized. See id. at §§ 404.1510(b); 404.1572(b); 416.910(b); 416.972)b). Substantial gainful activity does not include daily or recreational activities, including "taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs. . . ." Id. at §§ 404.1572(c); 416.972(c).

The ALJ found that plaintiff has not engaged in substantial gainful activity at any time since the alleged date of disability onset. (R. at 19.) However, in redetermination cases because of provisions in § 1619 of the SSA, this step was skipped. See 42 U.S.C. § 1382h. The record shows that plaintiff has not worked in the past and is not currently working. Thus, the ALJ's decision at step one is supported by substantial evidence, and the Court will proceed to step two.

**b.  Plaintiff suffers from a severe impairment.**

The second step of the disability evaluation requires the Court to determine whether plaintiff suffers from a severe impairment. See 20 C.F.R. §§ 404.1520(c); 416.920(c)(2000).  If a claimant does not suffer from a severe impairment, then he or she cannot be considered disabled, and thus, he or she is ineligible for DIB.  See id.  To find that a severe impairment exists, a claimant must have "any impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities. . . ." Id.  The impairment must be the product of "anatomical, physiological, or psychological abnormalities," and it must be established by "medical evidence consisting of signs, symptoms, and laboratory findings. . . ." Id. at §§ 404.1508; 416.908.

Examples of basic work activities which must be significantly limited by the impairment include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers, and usual work situations; and
>
> (6) Dealing with changes in a routine work setting.

Id. at §§ 404.1521(b); 416.921(b). The combined effect of all of the impairments which an individual suffers shall be considered together, without regard for whether any one of those symptoms would individually be enough to qualify as a severe impairment. See id. at §§ 404.1523; 416.923. The Supreme Court has held that this step of the disability evaluation is a de minimis threshold. See Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987). The purpose of requiring such a threshold showing of medical severity is to increase "the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." Id. at 153. Accordingly, the severity determination must have "a strictly medical basis . . . without regard to vocational factors." Id. at 151 (quoting the Senate Report accompanying the 1984 amendments.)

The ALJ found that the evidence established that plaintiff has a severe impairment as a result of obstructive sleep apnea, partial complex seizure disorder, and obesity.  Statements from treating and nontreating physicians, as well as plaintiff's testimony, indicate that plaintiff has problems with seizures and a sleeping disorder.  These are severe impairments within the meaning of the SSR.

The ALJ also considered plaintiff's other complaints, including her eyesight, knee problems, migraines, and an adjustment disorder.  While plaintiff asserted that she was unable to work, in part, due to being legally blind without glasses, she also stated that she has normal vision and is able to read and perform normal daily activities with glasses.

Plaintiff also sustained a contusion of the right knee in April, 2000, and underwent arthroscopic surgery in October, 2001.  However, the record reflects that by December, 2001, the knee had healed, and plaintiff was walking without a limp.  Physical examinations revealed no significant difficulty in standing, walking, or sitting, and there was no evidence of motor weakness or nerve damage in the extremities.  Additionally, plaintiff asserted a long history of migraine headaches, but the pain associated with the headaches was adequately relieved by medications such as Midrin or Excedrin Migraine.

In February, 2000, plaintiff was diagnosed with an adjustment disorder, with mixed disturbance of emotion and conduct, which appears to have been situational, as she was dealing with a pregnancy and subsequent abortion.  Plaintiff did well during counseling for the adjustment disorder, but in April, 2000, she indicated that she did not

have the time to devote to counseling.   Consequently, the ALJ found that based on the overall evidence, that the other conditions were minor, nonexistent, or responsive to treatment.  Furthermore, plaintiff did not voice any of the complaints during the course of the hearing when asked to describe what conditions precluded her from working.  As a result, the conditions were found to be nonsevere.

Substantial evidence exists to support the ALJ's finding that plaintiff's eyesight, knee problems, migraines, and adjustment disorder are not severe but that plaintiff's partial complex seizure disorder, obstructive sleep apnea, and obesity are severe.  Having found these disabilities to be severe, the ALJ properly proceeded to step three of the analysis.

c. **Plaintiff does not suffer from an impairment or combination of impairments that meets or equals one found in the listings**.

The third step of the evaluation requires a determination of whether plaintiff suffers from an impairment or impairments which meet(s) or equal(s) one found in the listings set forth in Appendix 1.  See id. at §§ 404.1520(d); 416.920(b)(2000).  The listings provide a description "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." Id. at §§ 404.1525(a); 416.925(a).  The impairment must have a duration of at least twelve months, unless such impairment is expected to cause claimant's death.   See id.; see also id. at §§ 404.1509; 416.909. Without more, a diagnosis that a claimant has an impairment listed in the Appendix does not automatically result in a finding of a disability.  See id. at §§ 404.1525(d); 416.925(d).  Claimant has the burden to show

through medical evidence, such as symptoms, signs, doctors opinions, and laboratory findings, that his or her condition meets the precise criteria set out in the listings for that particular impairment.  See id.

If a claimant's impairment or impairments can be found in the listings, or are equal to impairments that are set forth in the listings, a claimant will be considered disabled without considering his or her age, education, or work experience.  See id. at §§ 404.1520(d); 416.920(d).  A claimant's impairments are medically equivalent to a listed impairment found in Appendix 1 "if the medical findings are at least equal in severity and duration to the listed findings." Id. at §§ 404.1526(a); 416.926(a).  In order to make a determination as to medical equivalency, the SSR state:

> We will compare the symptoms, signs, and laboratory findings about your impairment(s), as shown in the medical evidence we have about your claim, with the medical criteria shown with the listed impairment.  If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal.  If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment.

Id.  Therefore, just because an impairment is not listed within the Appendix, it does not necessarily follow that the claimant's impairment will not be considered a disability.  If the listing is met, then a claimant is considered disabled and is entitled to DIB and/or SSI.  If a listing within Appendix 1 is not met, then a claimant has the burden to show that he or she is unable to perform past relevant work.

The ALJ found no evidence to show that plaintiff's impairments are severe enough to meet or medically equal the impairments listed in Appendix 1, Subpart P, Regulation No. 4.  Plaintiff's seizure disorder should be analyzed under sections 11.02 or 11.03 (seizure disorders), and the obstructive sleep apnea under section 3.10 (sleep related breathing disorders).

Under section 11.02, plaintiff's seizures must be documented by a detailed description of typical seizure patterns, including all associated phenomena and occurring more frequently than once a month, in spite of at least the months of prescribed treatment.  They must include daytime episodes (loss of consciousness and convulsive seizures), or nocturnal episodes, manifesting residuals which interfere significantly with activity during the day.  Under section 11.03, plaintiff must demonstrate the same "with alteration of awareness or loss of consciousness of unconventional behavior or significant interference with activity during the day."

The evidence demonstrates the extent of plaintiff's condition and the extent to which they are controlled with treatment.  As evident from plaintiff's medical record, in May, 2000, plaintiff had no symptoms if compliant with treatment.  In fact, she reported that almost all nocturnal seizures had been eliminated.  According to plaintiff, when she used the CPAPD, she tended not to have any seizures, but when she did not use the CPAPD, she had some small seizure activity at night.  In January, 2001, plaintiff reported significantly fewer episodes when using CPAPD and no significant seizures at all, except when she forgot to take her medication.  The record reflects that in March, 2002, use of the CPAPD

and medication kept plaintiff's seizures under control.  There is recurring evidence from treating physicians that demonstrates plaintiff's ability to control the seizures when she takes her medication regularly and uses the CPAPD.

Plaintiff's seizure activity increased from March, 2002, until August, 2002, when plaintiff's mother reported that plaintiff had ten grand mal seizures.  However, during that time period, plaintiff also underwent a successful tonsillectomy, due to problems tolerating the CPAPD.  In September, 2002, after the tonsillectomy, a physical examination revealed an excellent airway and healing, and plaintiff was reported as having no more observed apnea.

The evidence clearly reveals that when plaintiff consistently uses the CPAPD and takes her medication as prescribed, the number of seizures is significantly reduced.  The evidence also reveals that the tonsillectomy has significantly relieved plaintiff of any observed symptoms of obstructive sleep apnea.  When plaintiff does experience seizures, they are nocturnal and do not appear to have any significant interference with her activities during the day.  Plaintiff is able to perform household chores, rake leaves, plant flowers, watch TV, listen to the radio, shop, play cards, and socialize with friends.

The Court recognizes that plaintiff does suffer from impairments and pain, which are evidenced by multiple doctors reports and plaintiff's own testimony.  However, the DDS physician found that plaintiff's impairments have no more than minimal effect on her ability to perform basic work-related activity, and the record reflects that she has no more observed apnea.  The medical record, and plaintiffs daily

activities, reflect that her impairments are reasonably controlled by treatment and medication and are not completely disabling.

Accordingly, in light of the diminished severity of plaintiff's apnea, her daily activities, and the medical record in general, the evidence does not support limitations severe enough to satisfy the listings. The ALJ's opinion is supported by substantial evidence, and the Court proceeds to step four of the evaluation process.

### d.   **Plaintiff is unable to perform past relevant work**.

If the impairment experienced by plaintiff does not meet or exceed those set forth in Appendix 1, it is necessary to proceed to steps four and five. Step four of the analysis requires the Court to compare what plaintiff can still do, despite his or her impairments. See 20 C.F.R. §§ 404.1520(e); 416.920(e)(2000). The burden still remains with plaintiff to prove that he or she is unable to perform past relevant work. See Thorne v. Wienberger, 530 F.2d 580, 582 (4th Cir. 1976). If plaintiff is found to be capable of performing past relevant work, then he or she will not be considered to be disabled, and the claim will be denied. However, if plaintiff is unable to return to past relevant work, the analysis proceeds to step five, and the burden shifts to the Commissioner. See 20 C.F.R. §§ 404.1566, 416.966 (2000).

In determining whether a claimant is able to perform past relevant work, the Court is directed to look at a medical assessment of the individual's RFC. See id. at §§ 404.1545, 416.945. The RFC provides the Court with a report of what the individual can still do despite his or her impairments or combination of impairments as well as a vocational assessment of past job requirements. If a claimant's RFC exceeds

requirements of his or her past relevant work, then he or she is determined to be able to return to his or her past relevant work, and the claim can be denied.  See id. at §§ 404.1560(b); 404.1561; 416.960(b); 416.961.  However, if a claimant's RFC has been reduced below the requirements of his or her past relevant work, then the test at step four is met, and the evaluation proceeds to step five.  See id. at §§ 404.1560(c), 416.960(c).

Plaintiff has not worked in the past and has no relevant work experience of any kind.  Due to plaintiff's excessive drowsiness and/or seizures when noncompliant with medical treatment, the DDS advisory assessment indicates that plaintiff has the RFC to work at all exertional levels, except at unprotected heights or around dangerous machinery.  The assessment also indicates that plaintiff has no severe mental impairments, which is consistent with the overall evidence, and was afforded significant weight by the ALJ.

Although Dr. Marstellar stated that plaintiff is disabled because of the seizures, the issue of her disability is one reserved for the Commissioner of the Social Security Administration in accordance with the Social Security Ruling 96-5p.  The DHO found that plaintiff's impairments have no more than minimal effect on her ability to perform basic work related activity, and therefore, she has no severe impairments.  However, the finding was not adopted in total by the ALJ because it did not afford plaintiff the benefit of the doubt. Accordingly, the ALJ adopted the findings of the DDS advisory assessment that plaintiff retained the RFC to perform the nonexertional requirements of work at all exertional levels, except at unprotected heights or around

34

dangerous machinery due to potential excessive drowsiness and/or seizures, when noncompliant, and no severe mental impairment.

The ALJ's determination is supported by substantial evidence, including plaintiff's own testimony. Both treating and nontreating physicians found that plaintiff's impairments are reasonably controlled with medication and the use of the CPAPD. Furthermore, plaintiff's impairments, as reflected by her daily activities, have no more than a minimal effect on her ability to perform basic work related activities. As a result, it appears that the ALJ's limitations are consistent with the record as a whole. Because the ALJ opinion is based on substantial evidence, the Court moves to step five of the analysis.

### e. __Other jobs exist within the local and national economy which plaintiff could perform__.

The fifth step in the analysis considers whether plaintiff can perform any other work available in significant numbers in the national economy, considering plaintiff's age, education, and past work experience. See 20 C.F.R. §§ 404.1566, 416.966 (2000). Step five is reached when the claimant is not engaged in substantial gainful activity and has a severe impairment that does not meet or equal the listings but prevents the claimant from performing past relevant work. In assessing plaintiff's ability to perform other work within the economy, the Court will look at exertional limitations, those limitations or restrictions which impact only strength activities, and nonexertional limitations, those limitations and restrictions which impact nonstrength activities such as concentration and ability to follow instructions. See id. at §§ 404.1569(a); 416.969(a). At step five, the burden of proof shifts to the

Commissioner to establish that plaintiff has the ability to perform other work.  See Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

If a claimant's impairment solely limits his or her physical function, then the Court is directed to conduct an analysis under the medical/vocational regulations.  If a claimant's impairment is solely nonexertional or mental, then full consideration must be given to all of the relevant facts of the case and in accordance with the definitions and discussions of each factor in the appropriate section of the SSR.  See 20 C.F.R. Pt. 404, Subpt. P, App. II § 200.00(a).  However, if a claimant suffers from an impairment or impairments causing both exertional and nonexertional limitations, the Court is directed to first determine whether a finding of disability is possible based on the exertional limitations alone.  If a claimant would not be disabled based on exertional limitations alone, then the Court should determine whether the nonexertional limitations suffered by the claimant would render him or her disabled.  See id. at § 200.00(e)(2).

Since plaintiff has established that she has no past relevant work, the burden of proof shifts to the SSA to show that there are jobs existing in significant numbers to which plaintiff is able to make a successful vocational adjustment, considering her age, education, work experience, and RFC.  At the time of the ALJ's opinion, plaintiff was twenty-one years old, classified as a "younger individual" with a "limited" education, and has no past work experience.

Plaintiff's ability to work at all exertional levels is compromised by her nonexertional environmental limitations and restrictions.  The ALJ credited the VE, who testified that assuming

36

plaintiff's specific work restrictions, plaintiff is capable of making a vocational adjustment to work that exists in large numbers in the national economy.   Therefore, the ALJ found that plaintiff was not disabled under the SSR.   In light of her age, education, experience, and the VE's testimony, the ALJ's opinion is supported by substantial evidence, and plaintiff is not considered disabled.

### III.  RECOMMENDATION

For the foregoing reasons, the Court recommends that plaintiff's motion for summary judgment be DENIED and defendant's motion for summary judgment be GRANTED.

### IV. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten days from the date of mailing of this report to the objecting party computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three days permitted by Rule 6(e) of said rules.   See 28 U.S.C. § 636(b)(1)(C)(2000); FED.R.CIV.P. 72(b).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.   Thomas v. Arn, 474 U.S. 140

(1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).


                                        _____/s/_____
                                        **James E. Bradberry**
                                        **United States Magistrate Judge**

**Norfolk, Virginia**

    **December 23**  , 2005

<u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report was mailed this date to each of

the following:

        Scott B. Elkind, Esq.
        801 Roeder Rd., Ste. 550
        Silver Spring, MD 20910

        Kent P. Porter, Esq.
        U.S. Attorney
        8000 World Trade Center
        101 West Main Street
        Norfolk, VA   23510-1624

                Elizabeth H. Paret, Clerk

                By _____
                      Deputy Clerk

        _____, 2005